UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JUAN FIGUEROA,
    Petitioner,


    v.                                          CIVIL ACTION NO.
                                                13-13008-IT

BRUCE GELB,
    Respondent.

**REPORT AND RECOMMENDATION RE:
RESPONDENT'S MEMORANDUM OF LAW IN OPPOSITION TO
PETITION FOR WRIT OF HABEAS CORPUS
(DOCKET ENTRY # 16)**

**April 20, 2016**

**BOWLER, U.S.M.J.**

Respondent Bruce Gelb ("respondent"), Superintendent of the
Souza Baranowski Correctional Center ("SBCC"), seeks to dismiss
the above styled petition for writ of habeas corpus filed under
28 U.S.C. § 2254 ("section 2254").  (Docket Entry # 27).
Petitioner Juan Figueroa ("petitioner"), an inmate at SBCC,
attacks a March 2009 conviction for second degree murder in the
Massachusetts Superior Court Department (Suffolk County) ("the
trial court").

Petitioner seeks habeas relief on the following ground:

> Where there was evidence of provocation, whether instructing
> the jury that they could infer malice from the use of a
> deadly weapon authorized the jury to draw an
> unconstitutional inference in violation of the due process
> clause of the United States Constitution, since there is no
> rational connection between use of a deadly weapon and
> malice where evidence of provocation has been introduced.

(Docket Entry # 2, p. 2).  In addition to a failure to exhaust

state court remedies, respondent maintains that the rejection of the ground by the state courts was not contrary to or an unreasonable application of clearly established law as determined by the Supreme Court under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d)(1).

There is no indication that petitioner seeks an evidentiary hearing. Even if he did, a hearing is not warranted. Before allowing an evidentiary hearing, a federal "habeas judge 'must first consider whether such [a] hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.'" Companonio v. O'Brien, 672 F.3d 101, 112 (1st Cir. 2012) (quoting Teti v. Bender, 507 F.3d 50, 62 (1st Cir. 2007)). The petitioner "must therefore demonstrate that his allegations would entitle him to relief and that the hearing is likely to elicit the factual support for those allegations." Id.

Here, the record before the state courts includes the trial transcripts setting out the instructions and the testimony evidencing provocation and the use of a dangerous weapon. Moreover, petitioner does not identify facts missing from the state court record which, if elicited at an evidentiary hearing, would provide support for the Due Process ground for relief.

PROCEDURAL BACKGROUND

In May 2007, a grand jury sitting in the trial court

indicted petitioner for first degree murder in violation of

section one of Massachusetts General Laws chapter 265.  (S.A. 5,

94).[1]  After hearing six days of testimony, the trial judge

instructed the jury on first and second degree murder and

voluntary manslaughter.  Initially, the trial judge instructed

the jury on the requirement that inferences have a basis in the

facts in evidence.

> Any inference or conclusion must have a basis in the
> evidence.  You may draw inferences you find to be based on
> the evidence which are reasonable and proper and logical and
> which flow freely and naturally from the facts you determine
> to be true and accurate . . ..
>
> An inference must be based upon facts.  You cannot draw
> inferences upon inferences because then you get into a realm
> where you are not to go, and that's the realm of speculation
> or conjecture or wondering what if.  You are to make and
> draw inferences or conclusions which are based upon the
> evidence that you heard during the course of this trial.
> It's not get there on our guesses and our conjecture, they
> are not speculation.  They are conclusions founded upon
> fact.

(Tr. 8:20-21).[2]

　　　After setting out these and other general instructions, the

trial judge carefully explained the elements of first degree

murder including the element of malice.  It was in this part of

the instructions that the trial judge gave the instruction that

_____

　　　[1] "S.A." refers to a supplemental answer containing the
state court record filed by respondent.  (Docket Entry # 11).

　　　[2] Citations to "Tr." are to trial transcripts.  The number
preceding the colon refers to the day of the trial, here day
eight, and the number following the colon refers to the page in
the transcript of day in question.

petitioner maintains created an unconstitutional inference in light of the evidence of provocation.  After explaining that the Commonwealth has the burden to prove beyond a reasonable doubt that the defendant committed an unlawful killing, the trial judge instructed the jury that the Commonwealth "must further prove beyond a reasonable doubt that the killing was committed with malice." (Tr. 9:40).  The trial judge then instructed the jury that:

> Malice, as it applies to first degree murder with deliberate premeditation means that the Commonwealth must prove that the defendant had the specific intent to cause the death of [the victim].  That is, the Commonwealth must prove the defendant actually had it in his mind that he wanted to cause the death of [the victim], the deceased.
>
> As a general rule, *when the killing is caused by the intentional use of a dangerous weapon you may, but are not required, to infer malice*.  A dangerous weapon is an item which is capable of causing serious injury or death.  Malice may not be inferred if the use of the dangerous weapon was either unintentional or accidental or if it was not used by the defendant.

(Tr. 8:40) (emphasis added).  In describing the elements of second degree murder, the trial judge charged the jury that, "It's the same standard of malice." (Tr. 8:48).

The trial judge further instructed the jury on the elements required to establish voluntary manslaughter.  In so doing, the trial judge instructed the jury that first and second degree murder require the Commonwealth to prove malice and also to prove the absence of mitigating factors, including the mitigating circumstance that petitioner killed the victim in the heat of

4

passion upon reasonable provocation.  The relevant instructions read as follows:

> So let me just tell you about the crime of manslaughter. When a person is charged with murder, either first or second degree, in this case first degree, the Commonwealth must prove beyond a reasonable doubt that the defendant acted with malice as I've instructed you.
>
> The Commonwealth must also prove beyond a reasonable doubt the absence of certain mitigating circumstances which would prevent a defendant from acting with malice.  Mitigating circumstances are circumstances which lessen[] a defendant's culpability for an act.  Both the crimes of murder and manslaughter require proof of an unlawful killing.  But the crime of murder will be reduced to the crime of manslaughter if the killing incurred [sic] under mitigating circumstances that satisfy you that the defendant did not act with malice.
>
> In order to obtain a conviction of murder[,] the Commonwealth must prove beyond a reasonable doubt the absence of these mitigating circumstances.  The burden, as I told you, is always on the Commonwealth.
>
> Based on the evidence in this case the mitigating circumstances you should consider are whether or not the unlawful killing of [the victim] was in the heat of passion upon reasonable -- was in the heat of passion upon reasonable provocation and sudden combat, or through the excessive use of force in self-defense.

(Tr. 8:53-54).  The trial judge further instructed the jury that, "Mere words, no matter how insulting or abusive, standing alone do not constitute reasonable provocation" and that "[t]he provocation must come from" the victim.  (Tr. 8-55).  In the course of instructing the jury on voluntary manslaughter, the trial judge did not repeat the instruction allowing the jury "to infer malice" for murder if the killing was caused by the intentional use of a dangerous weapon.

After deliberations commenced, the jury asked the trial judge to read again "the definitions of first degree murder, second degree murder, and manslaughter." (Tr. 9:7). In response, the trial judge gave supplemental instructions outlining the requirements to prove all three offenses. Here too, the supplemental instructions on first and second degree murder did not repeat the instruction that the jury may infer malice with the intentional use by petitioner of a dangerous weapon.

The supplemental instructions regarding voluntary manslaughter reminded the jury that, "[I]f the Commonwealth has failed to prove the lack of these mitigating factors in order to prove malice[,] then manslaughter would apply." (Tr. 9:16). The trial judge then explained the mitigating factors including killing in the heat of passion. She repeated that mere words are not enough and added that, "Use of a deadly weapon by the victim, may amount to reasonable provocation." (Tr. 9:17). The trial judge then further explained the requirement that petitioner, if reasonably provoked, must not have cooled off at the time of the killing.[3]

---

[3]  The instruction reads as follows:

Provocation must be such that a reasonable person would be sufficiently provoked and would not have cooled off by the time of the killing, and that in this case the defendant was so provoked and did not cool off at the time of the killing.

After engaging in further deliberations, the jury found petitioner guilty of second degree murder. (Tr. 9:24). On March 9, 2009, the trial judge sentenced petitioner to life imprisonment. (S.A. 15, Tr. 10:28).

Petitioner filed a timely appeal. In the appeals court brief, petitioner raised the claim that the instruction that the jury could infer malice from the use of a dangerous weapon where there was evidence of provocation allowed the jury "to draw an unconstitutional inference since lack of provocation cannot be inferred simply because the defendant used a dangerous weapon." (S.A. 69) (capitalization omitted). Citing federal cases, petitioner argued that authorizing the jury to draw an unconstitutional inference "violated due process if 'under the facts of the case there is no rational way the trier could make the connection permitted by the inference.'" (S.A. 70) (quoting County Court of Ulster County v. Allen, 442 U.S. 140, 157 (1979)). After explaining the origin of the instruction under Massachusetts law, petitioner's brief to the appeals court concluded with the statement that, "Because the jury was authorized to draw an unconstitutional inference from the evidence, the defendant's conviction violated the due process clause of the Fourteenth Amendment of the United States Constitution . . .." (S.A. 72-73).

---

(Tr. 9:17).

7

On November 29, 2012, the appeals court affirmed the
conviction. (Docket Entry # 2-1). The opinion recites certain
facts, noted below,[4] and rejected the foregoing federal claim on
the merits.[5]

---

[4] These factual findings by the appeals court are presumed
correct, 28 U.S.C. § 2254(e), and petitioner does not rebut them.
In fact, petitioner's brief states that, "The important facts in
the present case are summarized in the Appeals Court memorandum."
(Docket Entry # 2).

[5] Petitioner does *not* argue that the appeals court did not
decide the merits of the federal ground for relief in the
petition thus resulting in de novo review. See Junta v.
Thompson, 615 F.3d 67, 71 (1st Cir. 2010) (when state court
decision "does not address the federal claim on the merits,"
federal "habeas court reviews such a claim de novo"); see also
Lyons v. Brady, 666 F.3d 51, 53-54 (1st Cir. 2012). He therefore
waived the issue. See Vallejo v. Santini-Padilla, 607 F.3d 1, 7
& n.4 (1st Cir. 2010); accord Coons v. Industrial Knife Co.,
Inc., 620 F.3d 38, 44 (1st Cir. 2010).
    In the alternative, the appeals court's citations to
Massachusetts as opposed to federal cases does not inevitably
lead to de novo review. As explained in Harrington, "When a
federal claim has been presented to a state court and the state
court has denied relief, it may be presumed that the state court
adjudicated the claim on the merits in the absence of any
indication or state-law procedural principles to the contrary."
Harrington v. Richter, 131 S.Ct. 770, 784-785 (2011). Moreover,
the federal standard of permissive inferences as a violation of
Due Process, see Ulster County Court v. Allen, 442 U.S. 140, 157-
163 ((1979), is similar to the Massachusetts standard. See
Commonwealth v. Doucette, 462 N.E.2d 1084, 1092-93 (Mass. 1984)
(based on instructions as a whole, language of instruction did
not impose "mandatory" presumption) (citing Commonwealth v.
Richards, 425 N.E.2d 305, 309-310 (Mass. 1984)); DeJoinville v.
Commonwealth, 408 N.E.2d 1353, 1357 (Mass. 1980) (citing
Commonwealth v. McInerney, 365 N.E.2d 815 (Mass. 1977)). Where,
as here, the state law standard for the claim "subsumes the
federal standard—that is, if it is at least as protective as the
federal standard—then the federal claim may be regarded as having
been adjudicated on the merits." Johnson v. Williams, 133 S.Ct.
1088, 1096 (2013); see Kirwan v. Spencer, 631 F.3d 582, 587 (1st
Cir. 2011) ("deference to the state court's determination is
warranted" if state court adjudicated a claim "under a state law

8

On December 12, 2012, petitioner filed an application for
further appellate review ("ALOFAR") in the Massachusetts Supreme
Judicial Court ("SJC") raising the issue of whether the
instruction that malice "may be inferred from the use of a
dangerous weapon creates an unconstitutional inference when
provocation is a live issue in the case."[6]  (S.A. 164).  The
ALOFAR began by recounting the origin of the instruction under
Massachusetts law.  (S.A. 164-165).  After citing this state law,
the ALOFAR presented the argument in terms of federal
constitutional law.  The relevant portion of the ALOFAR reads as
follows:

> Where there is evidence of provocation there is no rational
> connection between use of a dangerous weapon and proof of
> malice.  For an inference to be constitutional, there must
> be a rational connection between the fact proved and the
> fact inferred.  Leary v. United States, 395 U.S. 6, 33
> (1969); Tot v. United States, 319 U.S. 463, 467-468 (1943);
> McFarland v. American Sugar Refining Company, 241 U.S. 79,
> 86 (1916) . . ..
>
> The fact that the judge may have correctly instructed the
> jury on the elements of the offense, and there was
> sufficient other evidence of guilt does not cure the error.
> See Leary v. United States, 395 U.S. at 30-32 (statute which
> allowed, but did not require, a jury to infer that a person
> in possession of marijuana also knew that the marijuana had

---

standard that 'is at least as protective of the defendant's
rights as its federal counterpart'").  In any event, applying de
novo review leads to a conclusion that there was no Due Process
violation given the rational and common sense inference between
the basic and the inferred fact as discussed infra.

  [6]  The argument noted, correctly, that the instruction is
contained the Massachusetts Superior Court Criminal Jury
Instructions (Mass. Cont. Legal Educ. 1999).  (S.A. 164).

been illegally imported was held to violate due process).
(S.A. 166-167).  The ALOFAR concluded the argument by stating
that, "[T]he instruction violated the due process clause of the
federal constitution." (S.A. 169) (citing <u>Leary v. United
States</u>, 395 U.S. at 12, 36).  On December 18, 2012, the SJC
summarily denied the ALOFAR.  (S.A. 135).

<u>FACTUAL BACKGROUND</u>[7]

In March 2007, the victim, a 24 year old male, was living
with his mother in a duplex apartment in a building with other
apartments.  He had recently broken up with Darla Lenardis
("Lenardis") with whom he had a three year old son, Damian.
Damian spent weekends with his father at his grandmother's
apartment.

In March 2007, Lenardis was dating petitioner and the two
arrived at a parking lot in front of the apartment building at
approximately 9:30 p.m. on Sunday March 11, 2007 to pick up
Damian.  After saying good-bye to his mother with Damian, the
victim walked out the door with his son to the parking lot. The
victim's mother "glanced out the window" and saw her son hand
Damian to petitioner, who then "put Damian in the backseat of the
car" and "close[d] the door." (Tr. 2:93, 95, 97, 100-102).  She
then saw her son walk back towards the apartment before she

---

[7] Citations to the trial transcripts are provided only for
direct quotations.

"couldn't see no more."  (Tr. 2:102).

Petitioner testified that he fastened Damian into his booster seat and began walking around the back of the car.  The victim was "a couple feet away" at which point petitioner told the victim "he needs to be a better father."  (Tr. 6:237).  The victim, who had a "slim build" and weighed 142 pounds, then "turned around and said, 'what the f*** you say to me?'"  (Tr. 6:237, 2:77).  In response, petitioner, who had a "significant size advantage . . . over the victim" (Docket Entry # 2-1),[8] turned around and told the victim "straight in his face" that he needs "'to be a better father to Damian.'"  (Tr. 6:237-239).  The evidence "strongly support[ed] the inference that the victim" then "pulled out a knife."  (Docket Entry # 2-1).  Petitioner testified that he looked down at one of the victim's hands and saw what "looked like a knife."[9]  (Tr. 6:239).  By this time, Lenardis had gotten out of the car and was to the right of petitioner.

With the events taking place in an open parking lot, petitioner had "ample space . . . to retreat."  (Docket Entry # 2-1).  Petitioner was also "an arm's length behind" the driver's side door of the car.  (Docket Entry # 2-1). The car was running

---

[8]  Petitioner "was six inches taller than the victim and about fifty pounds heavier."  (Docket Entry # 2-1).

[9]  As noted by the appeals court, "provocation was a live issue."  (Docket Entry # 2-1).

11

with "the key in the ignition" thus "providing a second avenue of
retreat." (Docket Entry # 2-1).

The evidence also strongly supported the inference that the
victim pulled out the "knife first" and petitioner then "tackled
him as [petitioner] grabbed the knife, injuring his hand."
(Docket Entry # 2-1). Petitioner "testified that the *only* motion
he saw the victim make with the knife before he tackled him was
the motion required to pull it out." (Docket Entry # 2-1)
(emphasis in the original). The "significant injury" to
petitioner's hand was to his right thumb. (Docket  Entry # 2-1)
(Tr. 6:243, 245).

Upon tackling the victim as "he grabbed the knife,"
petitioner and the victim fell to the ground. (Docket Entry # 2-
1) (Tr. 6:239). In the meantime, Wei Ruan ("Ruan"), a teenager
who lived in a neighboring apartment building with his mother and
younger brother, had come out of his apartment and saw a woman
and two men. Ruan testified that it was dark that evening "but
the area was lighted." (Tr. 3:48). As he continued walking
across the parking lot, Ruan saw the two men face to face "about
an arms length" from each other and arguing. (Tr. 3:40-41). He
then saw one of the men jump the other man and the two men went
down towards the ground. (Tr. 3:46, 49). At that point, Ruan
could not see the two men on the ground because of a car. Almost
instantaneously, "Ruan heard Lenardis scream, 'stop it, get off

12

him.'"  (Docket Entry # 2-1) (Tr. 3:51-52).

Meanwhile, Michelle Ennis ("Ennis"), who lived in a neighboring apartment, was watching television in her bedroom. The bedroom had a window that provided a view of the parking lot. Shortly after 10:00 p.m., her attention was drawn to the sound of screaming outside.  After putting her television on mute, she heard a female voice saying what seemed to Ennis as "get off of him." (Tr. 2:226).  Looking out the window, she saw a woman, two men and a car.  One of the men was laying down "[o]n the sidewalk." (Tr. 2:238).  The other man was standing "by the driver's side door" of the car.  (Tr. 2:237).  The woman "was standing by the trunk in the back of the car." (Tr. 2:238). "Ennis testified she heard [the] woman scream, 'Oh my God!  What have you done?'"  (Docket Entry # 2-1).

The victim's mother, having stopped looking out the window, was heading to another room in her apartment when she also heard a scream.  She then ran down the stairs and out of the building into the parking lot.  Upon exiting the building, she saw her son and petitioner with petitioner "stooped down" with "maybe one knee up and one knee down" holding her "son in a headlock." (Tr. 2:109, 111, 113).  She saw that her son was on his back, which was between petitioner "and the ground." (Tr. 2:113). Reacting to what she saw, she tried to pull petitioner off her son but was unable to separate them.  She then tried scratching

13

and grabbing at petitioner's eyes, pulling on his eyes "two or three times." (Tr. 2:116).

Petitioner testified that, as he was on the ground fighting with the victim, he "felt a weight on his back." (Tr. 6:240). Looking back, he saw the victim's mother and told her to "'[g]et off of me . . . so I can get off of him," referring to the victim. (Tr. 6:240-241). The victim's mother testified that she then let go of petitioner whereupon he released her son, got up and "walked to his car." (Tr. 2:117). She did not see any weapons or a knife in petitioner's hands as he walked to the car.

Petitioner testified that he walked to the car and that Lenardis was also walking towards the car. Ennis, who was watching from her bedroom window, heard petitioner tell Lenardis more than four times to "get the f*** in the car." (Tr. 2:241). Petitioner testified that when he got into the car, he could not see out of one his eyes. With Lenardis and Damian in the car, he then drove away.

The victim's mother remained with her son and asked Ruan, who had come over to her, if he could pick up her son. She testified that her son then said he could not stand up and he had "got[ten] stabbed." (Tr. 2:124). In the meantime, Boston Police Officer Brian Lydon, who was less than a mile away, responded to a radio call at 10:14 p.m. and arrived at the scene. The victim's breathing "was labored." (Tr. 3:27).

14

An ambulance arrived shortly thereafter and took the victim to a hospital where he "was pronounced dead." (Tr. 2:139-140). Kimberly Springer, the medical examiner, testified that the victim had five stab wounds and that the stab wound to his chest was three to five inches deep. The stab wound to the chest fractured the fourth rib, penetrated the left lung and went "into the heart." (Tr. 6:113-115). It was "the fatal wound." (Tr. 6:115).

Overall, as stated by the appeals court and not rebutted by petitioner, see 28 U.S.C. § 2254(e), "the evidence strongly suggested that [petitioner] grabbed the knife from the victim and stabbed him five times before fleeing the scene and lying to his friends and acquaintances about what happened until he could create an exculpatory version of events with the help of an attorney." (Docket Entry # 2-1). After petitioner fled the scene with Lenardis and Damian, they arrived at the East Boston home of the D'Alessandro family where he and Lenardis had been that evening "around 7:30" or 8:00 p.m. (Tr. 4:171, 176-177, 179, 184-187). One of the occupants of the house that day and evening, Susan Bendahan ("Bendahan"), described Lenardis as "covered in blood" and acting "hysterical." (Tr. 4:186-187). Upon seeing Lenardis, Bendahan and Kathy D'Alessandro took her into the kitchen and washed one of her hands where she had a cut. Kathy D'Alessandro changed Lenardis' clothes in the kitchen and

put the old "clothing with the blood on it" in a plastic bag. (Tr. 4:193-194).

David P. LaPia ("LaPia"), a longtime friend of James D'Alessandro, was at the house throughout the afternoon and evening.[10] LaPia described petitioner as having "abrasions on his face, like he had been in a fight." (Tr. 4:98). Petitioner went upstairs to a bathroom where LaPia saw the wound to petitioner's right thumb bleeding and "maybe half an inch or so" deep. (Tr. 4:108). After petitioner came downstairs he spoke to Bendahan, who was in the living room by that time with Damian. In response to Bendahan's question of what happened, petitioner said that "they had gotten jumped" by "some kids" who had gotten out of a car and jumped them.[11] (Tr. 4:196).

Thereafter, petitioner left, leaving Lenardis and Damian at the D'Alessandros' house, and drove to his mother's house in Springfield. He arrived at his mother's house after midnight. She described petitioner as weak and shaking with a deep wound on his hand. She told him to go to the hospital. (Tr. 5:221). He did not go to the hospital because he wanted a lawyer. (Tr.

---

[10] LaPia acknowledged that he had had "about six beers and maybe three or four shots of scotch" between the time he arrived at the house around 1:00 or 2:00 p.m. and the time he left around 10:30 or 11:00 p.m. (Tr. 4:91-92). Bendahan had two "[v]odka and cranberry juice" drinks. (Tr. 4:180).

[11] Petitioner's testimony is not considered for the truth of the matter asserted but instead to show that he lied to his friends about what happened.

6:257).  Within a few minutes, petitioner's mother telephoned her other son who came to the house.  At some point, they went to the other son's home.  Petitioner spoke to an attorney on Tuesday March 13, 2007, who arranged for petitioner to turn himself into police.  Petitioner was arrested that evening.

DISCUSSION

A.  <u>Exhaustion</u>

Respondent initially moves to dismiss the petition because petitioner did not present the federal nature of the claim to the SJC and made only a passing reference to the Constitution in the ALOFAR.  (Docket Entry # 16).  Petitioner disagrees.  (Docket Entry # 2, p. 3).

A petitioner exhausts state court remedies by fairly and recognizably presenting the federal claim to the SJC.  <u>See</u> <u>Rosenthal v. O'Brien</u>, 713 F.3d 676, 688 (1st Cir. 2013) (citing <u>Baldwin v. Reese</u>, 541 U.S. 27, 29 (2004)); <u>Coningford v. Rhode Island</u>, 640 F.3d 478, 482 (1st Cir. 2011); <u>Clements v. Maloney</u>, 485 F.3d 158, 162-163 (1st Cir. 2007).  The ALOFAR is therefore the decisive document for exhaustion analysis.  <u>See</u> <u>Clements v. Maloney</u>, 485 F.3d at 162-165.

In order to "'fairly and recognizably'" present the federal claim to the SJC, the petitioner "'must show that he tendered [the] federal claim "in such a way as to make it probable that a reasonable jurist would have been alerted to the existence of the federal question."'"  <u>Id.</u> at 162 (quoting <u>Casella v. Clemons</u>, 207

17

F.3d 18, 20 (1st Cir. 2000)).  The myriad of ways to satisfy the
fair presentment requirement include "(1) citing a specific
provision of the Constitution; (2) presenting the substance of a
federal constitutional claim in such manner that it likely
alerted the state court to the claim's federal nature; (3)
reliance on federal constitutional precedents; and (4) claiming a
particular right specifically guaranteed by the Constitution."
Barresi v. Maloney, 296 F.3d 48, 52 (1st Cir. 2002); see
Coningford v. Rhode Island, 640 F.3d at 482 (listing these non-
exclusive ways to satisfy fair presentment).

For example, "A litigant wishing to raise a federal issue
can easily indicate the federal law basis for his claim in a
state-court petition or brief, for example, by citing in
conjunction with the claim the federal source of law on which he
relies or a case deciding such a claim on federal grounds, or by
simply labeling the claim 'federal.'"  Baldwin v. Reese, 541 U.S.
at 32 (dicta).  Limiting examination to the ALOFAR, the
presentation of the Due Process ground for relief in the ALOFAR
more than likely alerted a reasonable jurist to the federal
issue.  Indeed, the ALOFAR states that, "[T]he instruction
violated the due process clause of the federal constitution."
(S.A. 169).  It also cites Supreme Court cases setting out the
federal standard requiring a rational connection between the
predicate and the presumed facts.  (S.A. 166).  Accordingly, the

18

exhaustion argument does not provide a basis to dismiss the petition without prejudice.

B.  Due Process Violation

Respondent next moves to dismiss the Due Process ground for relief because the appeals court's ruling that the instruction allowing the jury to infer malice if petitioner used a dangerous weapon was not contrary to or an unreasonable application of clearly established Supreme Court precedent under the AEDPA. (Docket Entry # 27).  Petitioner maintains that the instruction created an unconstitutional inference because there was evidence of provocation.  According to petitioner, the instruction advised the jurors they could convict petitioner "if they found the defendant stabbed the victim with a knife, then [the jury] did not have to consider any other evidence."  (Docket Entry # 2, p. 6).  Petitioner further points out, correctly, that the appeals court found "there was evidence that the victim pulled a knife on the defendant" and that "'provocation was a live issue.'" (Docket Entry # 2, pp. 9-10).

The AEDPA's standard of review applies to state court decisions adjudicating the merits of the federal claim.[12]  28 U.S.C. § 2254(d); see Lyons v. Brady, 666 F.3d 51, 53-54 (1st

---

[12]  As explained in footnote five, petitioner waived the argument that de novo review applies.  Indeed, petitioner "concedes that as far as the petition for habeas corpus is concerned, the fact that the case may have been wrongly decided by the Appeals Court under Massachusetts law is beside the point."  (Docket Entry # 2, p. 10).

Cir. 2012).   The decision by the appeals court as opposed to the decision by the SJC denying the ALOFAR is the proper focus of review.   See Foxworth v. St. Amand, 570 F.3d 414, 425-426 (1st Cir. 2009) (examining "rationale of the intermediate appellate court where, as here, the state's highest court has summarily denied further appellate review").   Examining the instructions as a whole, the appeals court rejected the claim that, where provocation was a live issue, the instruction that malice could be inferred by petitioner's use of a dangerous weapon created an unconstitutional inference by removing the consideration of mitigating circumstances negating malice.

AEDPA review under the two categories of cases in section 2254(d) is decidedly deferential.   See Winfield v. O'Brien, 775 F.3d 1, 8 (1st Cir. 2014) (acknowledging "high bar" to overturn state court decision under AEDPA).   "[C]ollateral federal review is limited to determining whether the state courts' decision . . . 'was contrary to, or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States.'"   Id. (quoting 28 U.S.C. § 2254(d)(1)) (internal brackets omitted).

Under the first category, "A state court determination is 'contrary to' clearly established law 'if the court "'applies a rule that contradicts the governing law set forth' by the Supreme Court or 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and

nevertheless arrives at a result different from [its] precedent.'"'" <u>Linton v. Saba</u>, 812 F.3d 112, 122 (1st Cir. 2016) (quoting <u>Hensley v. Roden</u>, 755 F.3d 724, 730–731 (1st Cir. 2014)); <u>accord</u> <u>Ramdass v. Angelone</u>, 530 U.S. 156, 165-166 (2000) (decision is contrary to "clearly established federal law if it applies a legal rule that contradicts" the "prior holdings" of Supreme Court or "reaches a different result from" Supreme Court case "despite confronting indistinguishable facts").  Under the second category, the federal court may grant the writ if the relevant state court decision "'involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States.'" <u>Williams v. Taylor</u>, 529 U.S. 362, 404-405 (2000) (quoting statute with ellipses omitted).

An unreasonable application of clearly established federal law occurs if a state court decision "correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." <u>White v. Woodall</u>, 134 S.Ct. 1697, 1706 (2014); <u>Cullen v. Pinholster</u>, 131 S.Ct. 1388, 1399 (2011).  A state court does not unreasonably apply clearly established Supreme Court law by simply refusing to extend it "'"to a context in which the principle should have controlled."'" <u>White v. Woodall</u>, 134 S.Ct. at 1705 (internal ellipses omitted). In order to obtain federal habeas relief, "'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was

an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Id. at 1702 (quoting Harrington v. Richter, 131 S.Ct. at 786-787).  Habeas relief under section 2254(d)(1) is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." Id. at 1706-1707; see Linton v. Saba, 812 F.3d at 122-123 ("state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision")•(internal quotation marks and brackets omitted).

An objectively unreasonable application of the relevant jurisprudence differs from an incorrect or erroneous application of such jurisprudence. Williams v. Taylor, 529 U.S. at 411; accord Wiggins v. Smith, 539 U.S. 510, 520-521 (2003) ("state court's decision must have been more than incorrect or erroneous").  Under the unreasonable application prong, the "habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. at 411; accord Schriro v. Landrigan, 550 U.S. 465, 473 (2007) ("question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable--a substantially higher threshold").

"[C]learly established Federal law . . . includes only the holdings, as opposed to the dicta, of" Supreme Court decisions at the time of the state court decision.  White v. Woodall, 134 S.Ct. at 1702 (internal brackets and quotation marks omitted); Yeboah-Sefah v. Ficco, 556 F.3d 53, 65 (1st Cir. 2009) (clearly established federal law refers to "'holdings, as opposed to the dicta, of the *Supreme Court's* decisions at the time of the relevant state court decision'") (internal brackets omitted). "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,'" Parker v. Matthews, 132 S.Ct. 2148, 2155 (2012), and "diverging approaches" to an issue in courts of appeals may "illustrate the possibility of fairminded disagreement." White v. Woodall, 134 S.Ct. at 1703 n.3.  "[F]actually similar cases from the lower federal courts may" nonetheless may inform a determination particularly "when the relevant Supreme Court rule is broad and applies to a kaleidoscopic array of fact patterns." Rashad v. Walsh, 300 F.3d 27, 35 (1st Cir. 2002).

"The Due Process Clause of the Fourteenth Amendment 'protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" Francis v. Franklin, 471 U.S. 307, 313 (1985) (quoting In re Winship, 397 U.S. 358, 364 (1970)).  Clearly established Supreme Court law therefore "prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its

23

burden of persuasion beyond a reasonable doubt of every essential element of a crime." Id. (citing Sandstrom v. Montana, 442 U.S. 510, 520-524 (1979), and Mullaney v. Wilbur, 421 U.S. 684, 698-701 (1975)).  "'The threshold inquiry in ascertaining the constitutional analysis applicable to this kind of jury instruction is to determine the nature of the presumption it describes,'" namely, "whether the challenged portion of the instruction creates a mandatory presumption or merely a permissive inference." Francis v. Franklin, 471 U.S. at 313-314 (citation omitted); accord County Court of Ulster County, N.Y. v. Allen, 442 U.S. at 156-160.

The decision of whether jury instructions created a mandatory presumption or a permissive inference leads to different analytic standards of clearly established law under the Due Process Clause.  The Court in Franklin elucidates the distinctions as follows:

> Mandatory presumptions must be measured against the standards of Winship as elucidated in Sandstrom.  Such presumptions violate the Due Process Clause if they relieve the State of the burden of persuasion on an element of an offense.  Patterson v. New York, supra, 432 U.S., at 215, 97 S.Ct., at 2329 ("[A] State must prove every ingredient of an offense beyond a reasonable doubt and ... may not shift the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense").  See also Sandstrom, supra, 442 U.S., at 520-524, 99 S.Ct., at 2457-2459; Mullaney v. Wilbur, supra, 421 U.S., at 698-701, 95 S.Ct., at 1889-1890.  A permissive inference does not relieve the State of its burden of persuasion because it still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved.  Such inferences do not necessarily implicate the concerns of Sandstrom.  A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common

24

> sense justify in light of the proven facts before the jury.
> <u>Ulster County Court</u>, supra, 442 U.S., at 157-163, 99 S.Ct.,
> at 2224-2227.[13]

<u>Francis v. Franklin</u>, 471 U.S. at 314-315.  In the circumstances
of a permissive inference, clearly established Supreme Court law
requires a "rational connection" between the predicate basic fact
and the ultimate, presumed fact.  See <u>Leary v. United States</u>, 395
U.S. at 33 (reciting holding in <u>Tot v. United States</u>, 319 U.S. at
467).  "[A] statutory presumption cannot be sustained if there be
no rational connection between the fact proved and the ultimate
fact presumed, if the inference of the one from proof of the
other is arbitrary because of lack of connection between the two
in common experience."  <u>Tot v. United States</u>, 319 U.S. at 467-68.

As defined in <u>Ulster</u>, a permissive inference is one that
allows, but does not require, the jury to infer the elemental or
ultimate fact from proof of the initial or basic fact.  <u>County
Court of Ulster County, N.Y. v. Allen</u>, 442 U.S. at 157
(permissive inference "allows—but does not require—the trier of
fact to infer the elemental fact from proof by the prosecutor of
the basic one and which places no burden of any kind on the

---

[13]  As stated in <u>Ulster</u>, the statutory permissive inference
or presumption:

> comports with the standard laid down in <u>Tot v. United
> States</u>, 319 U.S., at 467, 63 S.Ct., at 1244, and restated in
> <u>Leary v. United States</u>, supra, 395 U.S., at 36, 89 S.Ct., at
> 1548.  For there is a "rational connection" between the
> basic facts that the prosecution proved and the ultimate
> fact presumed, and the latter is "more likely than not to
> flow from" the former.

<u>County Court of Ulster County, N.Y. v. Allen</u>, 442 U.S. at 165.

25

defendant"). A mandatory presumption "tells the trier that he or they must find the elemental fact upon proof of the basic fact, at least unless the defendant has come forward with some evidence to rebut the presumed connection between the two facts."[14] Id. (citing Leary v. United States, 395 U.S. at 30, and Tot v. United States, 319 U.S. at 469).

Determining the existence of a due process violation entails examining Massachusetts law. See Powell v. Tompkins, 783 F.3d 332, 337 (1st Cir. 2015); accord Waddington v. Sarausad, 555 U.S. 179, 192 n.5 (2009). The SJC's exposition of the parameters of first and second degree murder as distinguished from voluntary manslaughter is controlling and a federal habeas court is "duty bound" to adhere to state precedent. Powell v. Tompkins, 783 F.3d at 340, 341.

In Massachusetts, "to convict a defendant of murder in the first or second degree, a jury must find that the defendant formed the mens rea of malice aforethought." Commonwealth v. Judge, 650 N.E.2d 1242, 1246 (Mass. 1995). "The presence of malice is what makes an unlawful killing murder." Commonwealth v. Sires, 596 N.E.2d 1018, 1021-22 (Mass. 1992); see also Commonwealth v. Earle, 937 N.E.2d 42, 47 (Mass. 2010) (elements of second degree murder "are (1) an unlawful killing and (2)

---

[14] Mandatory presumptions subdivide into conclusory presumptions that entirely shift the burden of proof and rebuttable presumptions "that merely shift the burden of production to the defendant, following the satisfaction of which the ultimate burden of persuasion returns to the prosecution." County Court of Ulster County v. Allen, 442 U.S. at 157 n.16.

malice"). "The correct rule" in Massachusetts is that where, as
here, "the evidence raises the possibility that the defendant may
have acted on reasonable provocation, the Commonwealth must
prove, and the jury must find, beyond a reasonable doubt that the
defendant did not act on reasonable provocation." Commonwealth
v. Acevedo, 695 N.E.2d 1065, 1067 (Mass. 1998); accord
Commonwealth v. Whitman, 722 N.E.2d 1284, 1289-90 (Mass. 2000)
(in "murder case where evidence has raised the possibility of
provocation and voluntary manslaughter may be at issue, proof of
malice requires proof of the absence of provocation"). "Malice
and adequate provocation are mutually exclusive." Commonwealth
v. Acevedo, 695 N.E.2d at 1067.

    Mindful of the parameters of Massachusetts law, the appeals
court did not apply a rule "contrary to" the foregoing clearly
established law as determined by the Supreme Court. The appeals
court framed the argument in a manner corresponding to the
applicable clearly established rule. (Docket Entry # 2-1, pp. 3-
4) (addressing argument "that where, as here, provocation was a
live issue, the instruction that malice could be inferred from
the use of a dangerous weapon should have been omitted because it
permitted the jury to draw an 'unconstitutional inference'").
Examining the instructions as a whole in light of the challenged
instruction, the appeals court found the instructions correctly
informed the jury that mitigating circumstances negate the
element "of malice and that the Commonwealth bore the burden of

proving the absence of mitigating circumstances."[15]   (Docket
Entry # 2-1, p. 4).   Such a rule corresponds to examining the
language in the instructions to determine if it shifted the
burden of proof thus creating a mandatory presumption.   Finally,
the appeals court did not confront a set of facts materially
indistinguishable from Supreme Court precedent and arrive at a
different result.   The analysis therefore reduces to whether the
appeals court decision was an unreasonable application of clearly
established Supreme Court precedent.

The language of the challenged instruction regarding
petitioner's use of a dangerous weapon undeniably conveyed a
permissive inference.   A permissive inference "allows—but does
not require—the trier of fact to infer the elemental fact from
proof" of the basic fact.   County Court of Ulster County, N.Y. v.
Allen, 442 U.S. at 157.   Here, the trial judge instructed the
jury that, "when the killing is caused by the intentional use of
a dangerous weapon you *may*, but *are not required*, to *infer*
malice."   (Tr. 8:40) (emphasis added).   The instruction therefore
allowed, but did not require, the jury to infer the element of
malice from the basic fact that petitioner used a dangerous
weapon.   The instruction did not use mandatory language such as
"shall" or "presumed."   See McInery v. Berman, 621 F.2d 20, 24

---

[15]   Petitioner submits that the challenged instruction
removed the mitigating circumstance of reasonable provocation
that negates malice from the jury's consideration.   (Docket Entry
# 2).

(1st Cir. 1980) ("reasonable juror could not have understood 'may' to mean 'shall'").  Moreover, the language gave the jury a choice between finding or not finding that petitioner acted with malice by using a dangerous weapon.  <u>Cf.</u> <u>Hill v. Maloney</u>, 927 F.2d 646, 650 (1st Cir. 1990) ("jurors 'were not told that they had a choice, or that they *might* infer that conclusion; they were told only that [malice is implied]'") (quoting <u>Sandstrom v. Montana</u>, 442 U.S. at 515).  Accordingly, the due process inquiry is whether the appeals court decision was an unreasonable application of clearly established Supreme Court precedent that a rational connection existed between the predicate or basic fact (that petitioner used a dangerous weapon) and the ultimate fact inferred (that petitioner acted with malice).

Under Massachusetts law, "'Malice aforethought may be inferred if, in the circumstances known to the defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death would follow the contemplated act.'"  <u>Commonwealth v. Perry</u>, 733 N.E.2d 83, 93 (Mass. 2000).  Indeed, "[c]ommon sense dictates" that use of a deadly weapon to beat and electrocute a victim creates "a plain and strong likelihood of death."  <u>Id.</u>; see <u>Francis v. Franklin</u>, 471 U.S. at 314-315 (permissive inference violates due process "only if the suggested conclusion is not one that reason and *common sense* justify in light of the proven facts") (emphasis added).  Similarly, the First Circuit in <u>McInerney</u>, agreed with the SJC that:

29

"(a) judge does not violate constitutional principles of due process by advising the jury that, if they think it reasonable, they may infer the existence of malice from the fact, proved beyond a reasonable doubt, that a defendant shot the victim, stabbed him, or otherwise harmed him with a deadly weapon."

McInerney v. Berman, 621 F.2d at 24 (quoting Gagne v. Com., 377 N.E.2d 919, 923 (Mass. 1978)).

Petitioner nevertheless insists that the instruction allowing the jury to infer malice from petitioner's use of a knife "from that fact alone" without "hav[ing] to consider any other evidence to determine whether certain mitigating circumstances existed" created an unconstitutional inference. (Docket Entry # 2).  Under state law, as noted above, when the evidence raises the possibility that petitioner acted on reasonable provocation (the victim's use of the knife), the Commonwealth must prove beyond a reasonable doubt that petitioner did not act on reasonable provocation.  See Commonwealth v. Acevedo, 695 N.E.2d at 1067.

Here, the instructions fully informed the jury, repeatedly, that if the Commonwealth failed to prove the lack of mitigating factors, including reasonable provocation, then manslaughter would apply.  Moreover, not only did the instructions state on a *single* occasion in the context of the murder instructions that the jury could infer malice from petitioner's use of a dangerous weapon, the instructions simultaneously instructed the jury that voluntary manslaughter applied if the Commonwealth did not prove the lack of mitigating factors, including reasonable provocation.

For example, the supplemental instructions informed the jury
that, "[I]f the Commonwealth has failed to prove the lack of
these mitigating factors in order to prove malice[,] then
manslaughter would apply . . . And for the purposes of
manslaughter the elements are that the Commonwealth has proven
the unlawful killing of [the victim], but has failed to prove
malice because it failed to disprove that the killing was
committed in the heat of passion . . . ."  (Tr. 9:16).  Moreover,
the language instructing the jury that it "may" infer malice was
permissive and the general instructions informed the jury, in no
uncertain terms, that "[a]ny inference" they drew "must have a
basis in the evidence."  (Tr. 8:20).

    In addition, after explaining that "[p]rovocation must be
such that a reasonable person would be sufficiently provoked and
would not have cooled off," the trial judge continued to explain
that, "Use of a deadly weapon by *the victim* may amount to
reasonable provocation."  (Tr. 9:17) (emphasis added).  The
instructions therefore plainly allowed the jury to find
reasonable provocation by the victim's use of a deadly weapon
and, absent cooling off by the time of the killing, impose a
verdict of voluntary manslaughter.  The fact that the
instructions also allowed, but did "not require[]" (Tr. 8:40),
the jury to infer malice if it found that petitioner used a knife
did not prevent the jury from also finding, based on its view of
the facts, that the Commonwealth did not establish an absence of
reasonable provocation and thus impose a voluntary manslaughter

31

verdict.

As applied to petitioner, the facts evidencing provocation by the victim's use of a knife allowed the jury to convict petitioner of voluntary manslaughter.  The time period was relatively brief and petitioner saw what looked like a knife in the victim's hand.  Adhering to the instructions and finding the facts, however, the jury was not required to believe that petitioner did, in fact, not cool off and remained reasonably provoked at the time of the killing.  More specifically, the evidence allowed the jury to find that petitioner grabbed and took control of the knife, tackled the victim and, given his superior size and position on top of the victim,[16] overcame any resistance posed by the victim and was no longer reasonably provoked at the time of the killing.  Overall, there was a rational connection between petitioner grabbing the knife from the victim and using it to "stab[] him five times" (Docket Entry # 2-1) ("evidence strongly suggested that the defendant grabbed the knife from the victim and stabbed him five times") and the inference that he acted with malice.

Petitioner's use of the dangerous weapon in the form of the knife was also not the only or the sole basis for the jury to infer malice.  The location of the wound to the victim's chest and the penetration of the wound fracturing the rib, puncturing the lung and penetrating the heart provided independent evidence

---

[16]  Lenardis' excited utterances and Ennis' testimony support the above inference.

of malice.  <u>See</u> <u>Commonwealth v. Young</u>, 96 N.E.2d 133, 135 (Mass. 1950) (in addition to inference of malice created by use of deadly weapon, "there was evidence sufficient to warrant a finding that the revolver was fired intentionally" based on "location of the wound in Rivers's chest and the course of the bullet through his body indicate the position and level at which the revolver must have been held when fired").  Without considering petitioner's use of the dangerous weapon, the number of wounds inflicted provides additional evidence of malice.

Given these facts and the instructions in the context of the evidence of provocation as applied to petitioner, the appeals court's decision was not an unreasonable application of clearly established law in <u>Franklin</u>, <u>Ulster</u>, <u>Tot</u> and <u>Leary</u> requiring a rational connection between the basic fact (petitioner's use of the knife) and the ultimate, elemental fact (petitioner acted with malice).  Rather, even applying de novo review, there was no violation of the Due Process Clause entitling petitioner to habeas relief.

<u>CONCLUSION</u>

In accordance with the foregoing discussion, this court **RECOMMENDS**[17] that respondent's request to deny habeas relief

_____

[17] Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection.  <u>See</u> Rule 72(b), Fed. R. Civ. P.  Any party may respond to another party's objections within 14 days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.

(Docket Entry # 16, p. 20) be **ALLOWED** and that the petition be dismissed with prejudice.

                           __/s/ Marianne B. Bowler____
                           **MARIANNE B. BOWLER**
                           United States Magistrate Judge